608 A.2d 625

**Larry STATION, Jr., Petitioner,**

**v.**

**WORKMEN'S COMPENSATION APPEAL BOARD (PITTSBURGH STEELERS SPORTS INC.), Respondent.**

**PITTSBURGH STEELERS SPORTS, INC., Petitioner,**

**v.**

**WORKMEN'S COMPENSATION APPEAL BOARD (STATION), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 7, 1992.

Decided April 29, 1992.

Edward J. Abes, for petitioner/respondent, Larry Station, Jr.

Phyllis T. Procopio, for respondent/petitioner, Pittsburgh Steelers Sports, Inc.

Before CRAIG, President Judge, and FRIEDMAN, J., and NARICK, Senior Judge.

FRIEDMAN, Judge.

Larry Station, Jr. (Claimant) and Pittsburgh Steelers Sports, Inc. (Employer) cross-appeal the order of the Workmen's Compensation Appeal Board (Board) granting benefits for total disability to Claimant. We affirm in part, modify in part and remand for recalculation of the average weekly wage consistent with this opinion.

## HISTORY OF THE CASE

Larry Station was drafted by the Pittsburgh Steelers in 1986 while recovering from a back injury sustained in the Rose Bowl. On July 17, 1986, he signed a standard National Football League (NFL) player's contract with Employer. Still recovering from back surgery, Station was unable to perform in any way for the team until reporting for practice October 17, 1986. He then earned a place on the active roster and played six games before being injured in practice, November 28, 1986. He never played again for the duration of his one-season contract; however, Claimant received full salary through the remainder of that contract. The final payment was made at the close of the season, December 21, 1986. The total compensation he received during his "one year contract" was $53,017.86, not including an initial "signing bonus" of $11,000.00.

Claimant attended Employer's May 1987 "mini-camp" (tryouts for the upcoming season), but he failed to perform adequately and was "placed on waivers," May 30, 1987. This terminated his career with Employer, and he never again played professional football. He filed a claim petition with the Bureau of Workers' Compensation December 24, 1987, asserting the loss of his employment as a professional football player due to the November 28, 1986, injury. After

a series of four hearings the referee awarded Claimant Workmen's Compensation benefits at the then-current maximum weekly benefit of $347.00. The referee ordered Claimant to inform Employer of "all amounts of earned income he may receive" and permitted Employer to "modify compensation benefits accordingly based on an average weekly wage of $1,440.34." The referee also awarded Employer reimbursement of the injury-grievance lump-sum payment previously paid to Claimant, but ordered reimbursement to be computed at the net (after tax withholding) amount rather than the gross award of $18,000.00.

Both Claimant and Employer appealed the referee's decision. Employer was denied a supersedeas as to compensation. The Board affirmed the referee's decision in most respects, but ordered Claimant's average weekly wage to be set at $1,019.86.[1]

Issues before this court on cross appeals of the parties are limited to (1) the method or formula for calculating the average weekly wage of Claimant; (2) the amount of reimbursement due Employer for a lump sum paid Claimant through an "injury grievance" procedure under the collective bargaining agreement; (3) the date of disability for compensation purposes; and (4) the Employer's claim that the salary continuation paid through December 21, 1986 should be held to be an advance on workmen's compensation benefits, if the disability date were to be moved back to the November 28, 1986 injury date, as Claimant seeks.

Our scope of review in workers' compensation cases is limited to a determination of whether constitutional rights were violated, an error of law committed, or findings of fact are not supported by substantial evidence. *Cashmark v. Workmen's Compensation Appeal Board (Great A & P Tea Company)*, 135 Pa.Commonwealth Ct. 464, 580 A.2d 1189 (1990).

1. The Board also ordered, at Claimant's request, correction of an apparent typographical error in the referee's order setting the amount of medical expense reimbursement to Claimant, and changed the amount from the ordered $460.00 to the correct $640.00.

In this case, the relevant facts are not in dispute. However, we must set aside some of the conclusions of law drawn by the referee from those facts, as well as those of the Board in its affirming order, insofar as they have yielded an incorrect application of the law, Section 309 of The Pennsylvania Workmen's Compensation Act (the Act), Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 582. In applying the law we have considered the contract, the intent of the parties as shown by the facts of the case, and the unique working environment of the National Football League.

## AVERAGE WEEKLY WAGE

■ Claimant's injury, although sufficient to disable a professional football player, is not likely to preclude a person of Claimant's education from eventually establishing a new and perhaps even more lucrative career in a less physically demanding profession. The referee's order, as quoted *supra,* permits Employer to set off Claimant's future earnings against his average weekly wage for the purpose of modifying the amount of compensation benefits payable. Claimant has appealed the Board's revised average weekly wage, as he had the referee's figure. Employer accepted the Board's calculation.

The referee, in establishing Claimant's average weekly wage, based the calculation on total compensation divided by the number of weeks representing, as he said, "claimant's employment with the Pittsburgh Steelers ... from the time he signed the contract ... to the date he was terminated on May 30, 1987...." (Referee Finding of Fact, 25).

The Board, applying subsection 309(c), modified the amount of Claimant's average weekly wage by using the same amount of total compensation, but dividing by 52 weeks. In so doing, the Board interpreted the so-called "one year contract" as defining the period of employment covered by the compensation actually received. The result was, of course, accepted by Employer, as it yields the lowest possible average weekly wage. The Board referred

to the "Collective Bargaining Agreement contract" [sic] as "figuring wages on a yearly basis." We do not know from this whether the Board actually was referring to the NFLPA (National Football League Players' Association) Collective Bargaining Agreement of 1982, in effect in the instant case, or to the standard NFL Player's Contract entered into by these parties. In either case, the Board erred in its interpretation. Pursuant to the terms of the Collective Bargaining Agreement, the particular contract controls, and the pertinent language of the contract is as follows:

1. TERM. This contract covers one football season, and will begin on the date of execution or February 1, 1986, whichever is later, and end on February 1, 1987....

This is hardly crystal in its clarity, however, and must be construed in light of other contract terms, the collective bargaining agreement, and the practices and behavior of the parties—players, coaches, and team management—during their football "year." This court has endeavored to do just that.

Of particular relevance is the pattern of payment utilized by Employer, which pays players immediately after each game, apparently withholding all compensation until the first game of the season. This unique and irregular method of compensating employes has led to considerable confusion on the part of the parties, the referee, the Board, and this court in attempting to make it fit the relatively simplistic approach of the Act in setting average weekly wages for claimants. Perhaps there are motivational factors involved in paying football players immediately after a game, and there are advantages perceived by the coaching staff. Even if the result is not what we on the outside might see as "salary" in the usual sense, this method of payment presumably has been devised to serve the unique purposes of Employer. It is not for us to speculate as to what was intended. Rather, we will draw the most direct inferences from the facts found by the referee.

In Section 309 of the Act, subsections (a), (b), (c), and (d), all begin identically: "If at the time of the injury the wages are fixed ...;" followed by a formula for calculating an appropriate average weekly wage. In this case, however, the wages are not fixed; not (a) by the week, (b) by the month, (c) by the year; nor (d) by the day, hour or output. At subsection (d) the statute addresses those more difficult cases where the employe has worked only a short period of time prior to injury, but still in a job involving "fixed" wages, and prescribes a method for projecting,

> the amount he would have earned had he been so employed ... the full thirteen weeks ... unless it be conclusively shown that by reason of exceptional causes such methods [sic] of computation does not ascertain fairly the "total wages" of the employe....

Section 309(d) of the Act, 77 P.S. § 582(d).

This subsection directs that "the average weekly wage shall be the wage *most favorable to the employe*," and introduces the concept that the object is to, "*ascertain fairly* the total wages ...*" (emphasis added). Subsection (e) addresses the problem of establishing average weekly wages in cases involving seasonal employment and directs that:

> the average weekly wage shall be taken to be one-fiftieth of the total wages which the employe has earned from all occupations during the twelve calendar months immediately preceding the injury, unless it be shown that during such year, by reason of exceptional causes, such method of computation *does not ascertain fairly* the earnings of the employe, in which case the period for calculation shall be *extended so far as to give a basis for the fair ascertainment* of his average weekly earnings.

Section 309(e) of the Act; 77 P.S. § 582(e) (emphasis added).

The framers of the Act endeavored to establish the level of average weekly wages by first disposing of all of the easy cases, the "fixed by" periodic wages, and then by suggesting ways of arriving at "a fair ascertainment" for more difficult cases. We must in this instance extend this reasoning in the direction and with the guidance provided by

the statute. We must not, as attempted by both the referee and the Board, manipulate the facts of the case to fit a prescription not designed for this situation. They appear to have arrived first at what seemed a reasonable result, and then to have "found" the facts and arrived at conclusions to support it.

We believe that the referee pursued the correct reasoning in basing the average weekly wage on the total compensation paid Claimant, divided by the actual number of weeks for which Employer paid him, whether he was performing actual work or was contractually excused from the compensated performance because of injury. However, contrary to the interpretation by the referee, under this contract the compensation period was to begin with the first day of preseason training and continue through December 21, 1986, the actual completion of the contract year; i.e., the last date on which Claimant was paid.[2]

Although, as the referee noted (Referee finding of fact, 26), the player "is obliged to maintain his physical fitness and adhere to certain other requirements," these are minimal and generally unenforceable constraints. Not one of these conditions precludes the player's having a full-time second career from January until the start of preseason training, so long as it is not playing professional football or in other hazardous employment which would jeopardize his next NFL season. Presumably he would not have to "maintain physical fitness" by any prescribed or monitored program or regimen, but merely to be fit and able to play when he appears for training. Employer exercises no direct control over the player in achieving that objective, nor does it compensate him for doing so. It is not a function of his performance, merely a condition of continued employability. We believe that both the Board and the referee erred in

2. This was also the last date on which he would have been paid had he not been injured. Any post-season performance for which he might have been eligible if not injured would have been compensated outside the basic contract, as set out in the NFLPA Collective Bargaining Agreement, Article XXVIII: Post-Season Play.

extending the season of employment to include these periods of inactivity or of independent activity.

Although we agree with the general prescription by the referee that the average wage should be calculated by dividing the actual compensation paid Claimant by the number of weeks of the employment, we disagree with his conclusions as to the definition of that period. The referee concluded that the period of compensable employment was from the date the contract was signed until the date that Claimant was placed on waivers. We hold that the signing date of the contract is incidental, an insignificant date that does not of itself trigger any immediate duty on the part of either party. It neither begins the performance of the player for compensation, nor payment by the employer.[3] Contract signing dates may differ over a period of many months for the various members of the team. The beginning of the period of compensated employment, the official date of activation for compensation purposes, is the opening of preseason training camp, as clearly established under the language of the contract:

> 6. PAYMENT. ... If this contract is executed or Player is activated after the start of Club's official preseason training camp, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi-weekly portions of his yearly salary becoming due and payable after he is activated.

NFL Standard Player's Contract.

Clear from this language is that the "yearly" salary set out in the contract is an anticipated maximum to be paid given the player's being "activated" (i.e., appearing for practice,

3. Although the signing did result in payment of the so-called "signing bonus," this type of bonus has been held by us in *McGlasson v. Workmen's Compensation Appeal Board (Philadelphia Eagles Football Club)*, 125 Pa.Commonwealth Ct. 487, 557 A.2d 841 (1989), *pet. for allow. den.*, 525 Pa. 650, 581 A.2d 575 (1990) to be an independent (i.e., extra-contractual) obligation paid for the mere act of signing a contract with the potential employer, and not to be included in compensation for performance under the contract. It can be considered an inducement to sign, not compensation for work performed or to be performed for the Employer.

fit and able to play) on the first day of preseason training camp. If he does not become activated until some later date, his salary is prorated over the remainder of the season; in other words, he is "docked" for failure to appear for work.

In this case, Claimant was still recovering from injury and unable to report for work until activated by appearing for practice, presumably fit and ready to play, on October 17, 1986, after the first six games of the season had been played. Under the clear provision of paragraph 6, pertaining to payment, *supra*, Claimant's salary was "reduced proportionately," and he was "paid the weekly or bi-weekly portions of his yearly salary becoming due and payable after he [was] activated." The contract thus gives us the starting date of the period of compensation; namely, the day he was activated; ergo, that found by the referee to have been October 17, 1986.

As to the termination of the period of compensation, although the date he was placed on waivers may have significance to Claimant as signaling the end of his career in the NFL, it had nothing to do with the contract year for which his compensation is in question. That contract "year" was for the 1986–1987 football season, and performance paid under that contract ended with the December 21, 1986 pay for the last regular season game.[4]

 Employer argues that, in the alternative to the 52–week contract year in accordance with subsection 309(c), which we have already rejected, the appropriate subsection covering this situation is 309(e), pertaining to seasonal employment:

4. Post-season game performance, if any, is covered by additional compensation, and although attendance at Spring mini-camp is a contractual requirement for those players ordered to report for this week or two of drills and workouts for the purpose of being inspected by the coaching staff, payment for this attendance is by a *per diem* type of compensation amounting to nominal expenses. It is paid over and above the player's contract compensation, as is the preseason training camp *per diem* paid to rookies under the Collective Bargaining Agreement.

(e) In occupations which are exclusively seasonal and therefore cannot be carried on throughout the year, the average weekly wage shall be taken to be one-fiftieth of the total wages which the employe has earned from all occupations during the twelve calendar months immediately preceding the injury, unless it be shown that during such year, by reason of exceptional causes, such method of computation does not ascertain fairly the earnings of the employe, in which case the period for calculation shall be extended so far as to give a basis for the fair ascertainment of his average weekly earnings.

Section 309(e) of the Act, 77 P.S. § 582(e).

We hold that employment as an *NFL player* is seasonal, based on the standard NFL Players' Contract which specifies that performance runs from the start of preseason training camp and includes the games of the regular schedule, and specifically precludes the player's off-season employment with any other football team. Although the occupation of professional football player can be conducted at various seasons throughout the year, as asserted in Claimant's brief, it is clear that being an *NFL player* is indeed seasonal, and most explicitly so, under the terms of the standard NFL player's contract. Under a fact pattern brought by a different player, subsection (e) might indeed provide "a basis for the fair ascertainment of his average weekly earnings." It might well be appropriate to the situation of an established player, one who had developed his off-season employment possibilities.

However, Claimant's "twelve calendar months immediately preceding [his] injury" include his final period in college and only amateur performance in his "trade." Further, it includes a period of approximately ten months during which he was more or less incapacitated by prior injury, recovering from back surgery. This can hardly be considered a representative employment year. The method of calculation in these more difficult cases is to be that which is most likely to yield a fair ascertainment of the average weekly wage. It is apparent from the facts peculiar to this claim-

ant that section 309(e) would not yield a fair ascertainment in this case.

Although no subsection under section 309 is entirely appropriate for computation of this claimant's wages, 309(d) provides some guidance:

(d) If at the time of the injury the wages are fixed by the ... output of the employe, *the average weekly wage shall be the wage most favorable to the employe,* computed by dividing by thirteen the total wages of said employe earned in the employ of the employer in the first, second, third, or fourth period of thirteen consecutive calendar weeks in the fifty-two weeks immediately preceding the injury ...;

If the employe has been in the employ of employer less than thirteen calendar weeks ... immediately preceding the injury, his average weekly wage shall be computed under the foregoing paragraph, taking "total wages" for such purpose to be *the amount he would have earned had he been so employed by employer the full thirteen calendar weeks (or three calendar months) immediately preceding the injury and had worked, when work was available to other employes in a similar occupation, unless it be conclusively shown that by reason of exceptional causes such methods [sic] of computation does not ascertain fairly the "total wages" of employe so employed less than thirteen calendar weeks (or three calendar months).*

Section 309(d) of the Act, 77 P.S. § 582(d) (emphasis added).

The foregoing demonstrates how far the statute would direct us to extend our projection, even to the point of speculation, in order to arrive at a *fair* ascertainment of the claimant's wages. Under the Act, the guidelines as to fairness toward the claimant in setting the amount of his average weekly wages are in place to guide a case-by-case treatment of unusual fact patterns such as this one. We held in *Miller v. Workmen's Compensation Appeal Board (Burnham Corp.)*, 72 Pa.Commonwealth Ct. 253, 456 A.2d 1114 (1983), that the referee did not err in concluding that

extreme deviations in the wages and work hours of employes in similar positions with the employer, as well as claimant's shift differential, "established a 'reason of exceptional causes' under the last clause in Section 309(d) and that other methods of wage calculation were consequently permissible in order to 'ascertain fairly' what the claimant's wages were.... Section 309(d) of the Act clearly allows for alternative methods of computation ..." (*Id.*, 72 Pa.Commonwealth Ct. at 256, 456 A.2d at 1116). We view the circumstances of this case to present an even more compelling "reason of exceptional causes," in the unique environment involving individually negotiated contracts for employes in similar positions, extreme variation in the wages contracted for by the various employe players, irregular work schedules never contemplated by the statutory concept of a work week, and a unique method for payment of compensation for the work performed.

Accordingly, we hold that in this case the average weekly wage is to be determined as follows: the undisputed total wages received by Claimant ($53,017.86) shall be divided by the number of weeks for which he was to be paid (contractually); namely, October 17 through December 21, 1986, or 10 pay weeks.[5]

## REIMBURSEMENT DUE EMPLOYER

■ Claimant was awarded $18,000.00 under the NFLPA Collective Bargaining Agreement grievance procedure which requires proof of the virtual equivalent of a compensable injury; i.e., that:

> [A]t the time an NFL player ... was terminated by a club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract.

NFLPA Collective Bargaining Agreement, 1982, Article IX: Injury Grievance.

---

5. Under the contract, actual dates of payment were based on the regular season games played by the team, not on calendar weeks.

The referee concluded, and we agree, that under the terms of the player's contract, the award was reimbursable to Employer:

> 10. WORKMEN'S COMPENSATION. *Any compensation* paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workmen's compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability *will be deemed an advance payment of workmen's compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workmen's compensation.*

NFL Player's Contract between Larry Station, Jr. and the Pittsburgh Steelers Sports, Inc. (emphasis added).

■ Employer initially appealed that portion of the referee's award which reimbursed Employer only the net (after tax withholding) amount of payment actually received by Claimant. Claimant now appeals the decision of the Board which reversed the referee and awarded Employer "reimbursement" based on the gross amount, $18,000.00. We agree with the Board's decision that the gross award to Claimant was his "payment," subject to reimbursement. That portion of an employe's compensation withheld by an employer as required by law remains the property of the employe, who can file an appropriate return to have it refunded to him if taxes are not owed thereon. The total amount of the award, therefore, was Claimant's payment, out of which Employer paid taxes on Claimant's behalf. Accordingly, we hold the entire (gross) amount of the award to be reimbursable and affirm the Board's decision that the amount is $18,000.00.

The Board, however, then ordered that amount to be divided by the average weekly wage and credit given for that *number of weeks* of compensation benefits, rather than dollar-for-dollar reimbursement. We cannot agree. Paragraph 10 of the parties' contract states unequivocally that

Employer, *"will be entitled to be reimbursed the amount of such payment out of any award of workmen's compensation." Id.* (emphasis added). The terms are unambiguous, and there is no reason to follow the Board's tortured analysis, founded on *Creighton v. Continental Roll & Steel Foundry Company,* 155 Pa.Super. 165, 38 A.2d 337 (1944).

The court in *Creighton* was faced with different facts and properly came to a conclusion inappropriate to the present case. *Creighton* narrowly addressed the situation where, "an employee is *totally disabled* and the employer, while denying any liability for workmen's compensation, nevertheless pays the employee regular stated amounts, weekly or monthly, ... in relief of the employee's incapacity to labor" *(id.,* 155 Pa.Superior Ct. at 173, 38 A.2d at 341) (italics in original; emphasis added), during the period when the employer was contesting liability for workmen's compensation. The Superior Court thus held the employer was entitled to a credit, "for compensation *for the weeks* in which its payments to him equalled or exceeded the [workmen's] compensation payable". *Id.* Here, the parties' contract states that Employer is "entitled to be reimbursed the amount of such [lump sum] payment out of any award of workmen's compensation." We hold that reimbursement of a lump-sum "amount" requires dollar-for-dollar reimbursement. We therefore reverse the Board's decision as to the method to be applied in reimbursing Employer and reinstate the referee's order for direct dollar-for-dollar credit from benefits payable.

## DATE OF DISABILITY

■ We affirm the findings and conclusions of both the referee and the Board establishing the date of disability as being May 30, 1987, the date Claimant was placed on waivers and for all intents and purposes terminated from employment by Employer. Prior to that date he had lost neither present nor prospective earnings. The Employer's claim that the salary continuation paid from the injury date

of November 28, 1986 through December 21, 1986 should be held to be an advance on workmen's compensation benefits, if the disability date were to be moved back to the injury date, thus becomes moot. Salary paid Claimant through December 21, 1986 cannot be an advance on workmen's compensation benefits, as Claimant did not become eligible for benefits until May 30, 1987.

An appropriate order will be entered.

McGINLEY, J., did not participate in the decision in this case.

## ORDER

AND NOW, this 29th day of April, 1992, the order of the Workmen's Compensation Appeal Board dated July 16, 1991, is hereby:

1. Affirmed as to the following:

(a) Claimant is granted disability benefits in the maximum weekly amount appropriate to the disability date of May 30, 1987, with statutory interest; and

(b) Employer may take reimbursement in the form of credit against said disability benefits; and

(c) From compensation paid to Claimant, not including the amount reimbursed Employer in (b), above, Employer will deduct 20 percent and pay it over to Claimant's attorney, in accordance with the fee agreement; and

(d) Claimant shall furnish Employer a regular accounting of all amounts of earned income he may receive, and Employer may petition the Bureau for modification of benefits accordingly; and

(e) If Employer has not already done so, Employer shall reimburse Claimant's attorney and Claimant the respective amounts in the referee's order as modified by the order of the Board, and medical expenses as ordered.

2. Modified in part, as follows:

(a) The formula for arriving at Claimant's average weekly wage is to be replaced with that set forth in this

opinion and shall be used henceforth in implementing 1.(d) of this order; and

(b) The amount of reimbursement due Employer under 1.(b) of this order shall be the full amount of the injury grievance award; i.e., $18,000.00.

This case is hereby remanded for the limited purpose of recalculation of Claimant's average weekly wage using the formula set forth in the opinion.

Jurisdiction is relinquished.