# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1999-WC-02093-COA

**MERIDIAN PROFESSIONAL BASEBALL CLUB AND LIBERTY MUTUAL INSURANCE COMPANY** APPELLANTS

**v.**

**BLAIR JENSEN** APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/15/1999 |
| TRIAL JUDGE: | HON. ROBERT WALTER BAILEY |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | MICHAEL CLAYTON BAREFIELD |
| ATTORNEY FOR APPELLEE: | KEVIN LEWIS |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| TRIAL COURT DISPOSITION: | THE CIRCUIT COURT REVERSED AND RENDERED THE COMMISSION'S ORDER AND HELD THAT JENSEN IS ENTITLED TO AN AWARD FOR TOTAL LOSS OF USE OF HIS LEFT ARM, OR 200 WEEKS OF PERMANENT DISABILITY PAYMENTS. |
| DISPOSITION: | REVERSED - 10/10/2000 |
| MOTION FOR REHEARING FILED: | 10/16/2000; denied 12/12/2000 |
| CERTIORARI FILED: | 12/27/2000; granted 3/29/2001 |
| MANDATE ISSUED: | |

BEFORE SOUTHWICK, P.J., BRIDGES, AND THOMAS, JJ.

BRIDGES, J., FOR THE COURT:

¶1. Blair Jensen was injured while playing baseball for the Meridian Brakemen and became disabled as a result of this injury on July 11, 1996. Jensen filed a petition to controvert with the Workers' Compensation Commission, claiming that he was entitled to permanent disability payments. The trial of this matter was held on January 12, 1999, and was heard by an administrative law judge. The administrative judge awarded Jensen compensation for a twenty-five percent permanent disability to his left arm. Jensen then filed a petition for review before the full Commission on April 14, 1999. The order of the administrative judge was affirmed by the full Commission on July 14, 1999.

¶2. Jensen then appealed to the Circuit Court of Lauderdale County. On November 15, 1999, the court entered an order awarding compensation for total loss of use of Jensen's left arm. Thereafter, Meridian Professional Baseball Club filed an appeal with this Court alleging error on the part of the lower court in its award of total loss of use to Jensen.

**I. WHETHER CLAIMANT'S ABILITY TO RETURN TO THE PRECISE DUTIES OF HIS EMPLOYMENT AFTER INJURY TO A SCHEDULED MEMBER RESULTING IN A 7% MEDICAL IMPAIRMENT *AUTOMATICALLY* ENTITLES CLAIMANT TO AN AWARD FOR TOTAL LOSS OF USE OF THE SCHEDULED MEMBER?**

**II. WHETHER THE CIRCUIT COURT ERRED IN DETERMINING THAT THE COMMISSION'S ORDER WAS CLEARLY ERRONEOUS AND CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE?**

## FACTS

¶3. Jensen was employed as a professional baseball player with the Meridian Brakemen. During a Brakemen game, Jensen was swinging the bat when he began to feel pain in his left shoulder. The pain continued even after his shoulder had been iced down. It was determined that Jensen's shoulder had been dislocated, causing constant pain to Jensen and preventing him from playing baseball due to several reoccurrences of the dislocation when he would attempt to play.

¶4. Jensen eventually underwent surgery on his shoulder, following the advice of an orthopaedic surgeon with whom Jensen had consulted about his injury. After the surgery, Jensen continued physical therapy for his shoulder. After Jensen returned to his home in Kingsburg, California, due to his inability to continue playing, he saw another doctor who prescribed additional physical therapy on his shoulder. Thereafter, a second surgery was performed to correct problems with the hardware that was placed in his shoulder during the first surgery. Additional physical therapy was then necessary. Jensen, who complained of continual pain, numbness and discomfort, even after the second surgery, began to see other doctors, in search of another opinion on the injuries to his shoulder. A third surgery was recommended by one of these doctors, which Jensen declined to undergo.

¶5. Maximum medical improvement was declared by Dr. Jean Walsh on July 1, 1997. Dr. Walsh further professed that Jensen was "unable to return to his usual profession as a baseball catcher" and that Jensen should be prohibited from doing work which would require "repetitive overhead lifting." Dr. Walsh later rated Jensen's impairment to his left arm at seven percent. Jensen claims that this injury restricts him from his "chosen profession" as a baseball player.

¶6. Jensen further alleges that baseball had been his only usual employment at the time of the injury. Subsequently to his injury, however, Jensen has worked as a sales associate for a sporting goods retail store, a scouting director for a college athletics association, a coroner's assistant and, at the time of the filing of this appeal, Jensen was employed as an imaging assistant at a hospital. All of these jobs were eventually abandoned by Jensen, not because of his shoulder injury, but for other valid reasons unrelated to his physical health. Further, Jensen has lifted weights and played other team sports for recreation since his injury. At the time of the hearing before the Commission, Jensen was a junior at Fresno State University, pursuing a college degree. Dr. Walsh asserted that Jensen, while he could not return to baseball as a catcher, could return to another type of gainful employment.

¶7. The crux of Jensen's argument is that, while he may be able to perform certain types of employment despite the injury to his shoulder, he is eligible to receive compensation for one hundred percent permanent occupational loss of use of his arm as set forth by the trial court because he can no longer play baseball, his usual and ordinary employment.

## STANDARD OF REVIEW

¶8. Appellate review of workers' compensation claims is a narrow one. It is well settled that "[t]he Commission is the ultimate fact finder." *Hardin's Bakeries v. Dependent of Harrell*, 566 So. 2d 1261, 1264 (Miss. 1990). "Accordingly, the Commission may accept or reject an administrative judge's findings." *Id.* In the case *sub judice*, the Mississippi Workers' Compensation Commission affirmed the order of the administrative law judge after thoroughly studying the record and the applicable law. Our standard of review is set forth in *Delta CMI v. Speck*, 586 So. 2d 768, 772-73 (Miss. 1991):

> Under settled precedent, courts may not hear evidence in compensation cases. Rather, their scope of review is limited to a determination of whether or not the decision of the commission is supported by the substantial evidence. If so, the decision of the commission should be upheld. The circuit courts act as intermediate courts of appeal. The Supreme Court, as the circuit courts, acts as a court of review and is prohibited from hearing evidence or otherwise evaluating evidence and determining facts. '[W]hile appeals to the Supreme Court are technically from the decision of the Circuit Court, the decision of the commission is that which is actually under review for all practical purposes.'

> As stated, the substantial evidence rule serves as the basis for appellate review of the commission's order. Indeed, the substantial evidence rule in workers' compensation cases is well established in our law. Substantial evidence, though not easily defined, means something more than a "mere scintilla" of evidence, and that it does not rise to the level of 'a preponderance of the evidence.' It may be said that it 'means such relevant evidence as reasonable minds might accept as adequate to support a conclusion. Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred.'

(citations omitted).

¶9. "This Court will reverse an order of the Workers' Compensation Commission only where such order is clearly erroneous and contrary to the overwhelming weight of the evidence." *Mitchell Buick, Pontiac & Equip. Co. v. Cash*, 592 So. 2d 978, 980 (Miss. 1991).

## LEGAL ANALYSIS

¶10. "'Industrial' disability is the functional or medical disability as it affects the claimant's ability to perform the duties of employment." *Walker Mfg. Co. v. Butler*, 740 So. 2d 315 (¶ 44)(Miss. Ct. App. 1998). The issue in cases such as the instant one is "the degree of loss of use of the member for wage earning purposes." *Id.* As such, the Commission must look to the evidence as a whole to determine whether the claimant has the ability to perform the duties of his usual employment. *Id.*

¶11. In the case at bar, the primary dispute centers around the meaning of "usual employment." From Jensen's point of view, usual employment is defined as whatever employment the claimant is engaged in at the time of his injury. On the other hand, the Meridian Professional Baseball Club (MPBC) argues that usual employment is not so limited. Both parties here rely heavily on their own interpretations of the Mississippi Supreme Court case of *McGowan v. Orleans Furniture, Inc.*, 586 So. 2d 163 (Miss. 1991). We agree that the law in this area is not crystal clear and has been the subject of much confusion. However, while the term "usual employment" is not defined specifically for the purpose of alleviating such confusion, we must look further into *McGowan* to determine the interpretation given to this phrase by the Mississippi

Supreme Court. Precisely, what we look to are the list of factors used by that court in determining wage earning capacity. Such factors include "the amount of education and training which the claimant has had, his inability to work, his failure to be hired elsewhere, the continuance of pain, and any other related circumstances." *McGowan*, 586 So. 2d at 167. These factors are what the court meant for the Commission to look to when reviewing the evidence *as a whole*. *Id.*; *Piggly Wiggly v. Houston*, 464 So. 2d 510, 512 (Miss. 1985).

¶12. We agree with MPBC that Jensen relies too heavily on the outcome of *McGowan* and neglects to look closely at the facts which necessitate such an outcome. In that case, McGowan was granted one hundred percent industrial loss of use of his left leg. *McGowan*, 586 So. 2d at 168. The reason for this decision by the Mississippi Supreme Court was that the Commission had failed to consider that McGowan was not only limited in his profession of carpentry, but he also had limited education and no training in any other type of employment which he could perform despite the loss of use of his leg. As such, he was severely hindered in the way of a "sit down" type of job, which the court declared would be the only type of work he could carry out. *Id.* In other words, it was a concern of the court that McGowan had virtually no other options for employment because carpentry was, in fact, the only profession in which he had ever been involved. *Id.* Also, due to his lack of education, he was not likely to be hired for a job that would accommodate his injury. *Id.* That is not the case with Jensen.

¶13. Jensen urges that he held other jobs prior to his injury, such as apple packing and construction work, which he is also prevented from doing because of his injury. However, the fact that he has held various jobs following his injury that do not require such strenuous activity or physical labor peaked the interest of the Commission. We find that the Commission was correct in considering that Jensen is completely capable of performing tasks such as those involved in the jobs he has held since his injury. We conclude that this emphasis on Jensen's present capabilities puts him in a position where he falls outside the category in which the court placed McGowan. Jensen's more recent jobs have not aggravated his injury, and conversely, his injury has not prevented him from doing the work required. Furthermore, we take notice of the Commission's observation that Jensen had a higher salary in some of these jobs than he ever acquired in his brief stint as a baseball player. Jensen admits that he did not leave those jobs due to his injury, but rather because of other circumstances having nothing to do with his injury. Jensen has the potential to do well in the work force due to his higher education and his ability to work in diverse positions, opportunities that McGowan, as noted by the Mississippi Supreme Court, did not have.

¶14. Additionally, Jensen relies heavily on the outcome of the *Piggly Wiggly* case. *Piggly Wiggly*, 464 So. 2d at 513. The respondent in that case was also found by the Mississippi Supreme Court to fall within circumstances warranting a one hundred percent industrial disability pursuant to the factors found in *McGowan*. *Piggly Wiggly*, 464 So. 2d at 513. Again, however, Jensen's situation is distinguishable from that of Mrs. Houston in the *Piggly Wiggly* case. *Id.* Houston was found by the court to have continual suffering from her injury with any small activity, including simply standing for long periods of time. *Id.* In addition, the court noted that Houston attempted to find other jobs, but was unable to obtain employment that would accommodate her injury. *Id.* This is not the case for Jensen. He, in fact, was not only able to gain other employment, but he also was able to perform the duties of these jobs without complaints of ceaseless pain and suffering such as Mrs. Houston claimed to endure.

¶15. Furthermore, we look to the facts in the case of *M.T. Reed Construction Company v. Martin*, 215 Miss. 472, 61 So. 2d 300 (1952). The claimant's situation in that case was found by the Mississippi

Supreme Court to merit an award of one hundred percent total loss of occupational use because of an injury to his leg, that is, he was "totally disabled." *M.T. Reed*, 215 Miss. at 478, 61 So. 2d at 303. The reasoning behind the court's holding was that, while it could be possible that in the future, after maximum recovery from his injury, Martin, the claimant, could pursue other types of jobs that would not exacerbate his injury, his age and the duration of his injury would ultimately prevent him from finding other gainful employment. *Id.* at 475, 61 So. 2d at 301. More to the point, the court determined that Martin was too advanced in age and that by the time that his injury had subsided in order for him to work again, it would be unreasonable for him to learn a new trade which would accommodate his disability. *Id.* at 478, 61 So. 2d at 303. Again, Jensen is easily distinguished from Martin. As previously mentioned, Jensen's injury is one that does not prevent him from finding any other gainful employment within a reasonable time, as with Martin. Time is clearly not an issue in this case as it was in *M.T. Reed* because Jensen has, in fact, already pursued other jobs since his injury. Moreover, Jensen is a very young man. He began his baseball career directly out of high school, sustaining his injury at the early age of twenty-one. Therefore, unlike Martin, Jensen has many days ahead of him to seek other jobs and continuing education, and he can learn new trades much more efficiently than a person of more advanced age, such as Martin.

¶16. We are convinced, based on the decisions of the Mississippi Supreme Court, that a claimant is not entitled to benefits based on a total loss of use of a scheduled member simply because he can no longer perform the duties of the job in which he was employed at the time of his injury. If a person who suffers from an injury is not able to carry out the tasks of his pre-injury employment, but can obtain other gainful employment with no difficulty due to appropriate education and versatility in performing job duties in other employment, it stands to reason that the injury from which he suffers must not be totally disabling. Jensen would have this Court believe and render that because he wants to be a baseball player, but he cannot do so due to his shoulder injury, he should be awarded a total loss. Unlike the claimants in the aforementioned cases, Jensen can not only obtain other gainful employment but has done those jobs with no aggravation to his injury. Also, Jensen has a higher education than that of the claimants with which he compares himself, thereby opening doors of opportunity which were not available to the previously discussed claimants. Jensen is a young man who has moved on to pursue a new career and carries on the activities of his life, such as recreational sports and physical workouts, with no further detriment to his shoulder. Additionally, we cannot ignore the testimony of his doctor, Dr. Walsh, who rated the loss of his arm at only a seven percent medical impairment and concluded that Jensen can perform the normal duties of his life and continue employment other than that of baseball playing or employment that requires overhead lifting. Because Jensen admits that he has been able to perform these post-injury jobs without incident, we are persuaded that he has not lost total use of his arm and is not entitled to such an award.

¶17. In *Walker Manufacturing Co. v. Cantrell*, 577 So. 2d 1243, 1247 (Miss. 1991), the Mississippi Supreme Court held that a reviewing court may not interfere with the decision of the Commission unless its action is deemed arbitrary or capricious. Here, we do not find that to be the case. In *Cantrell*, the claimant's injury is comparable to Jensen's injury in this case, with the claimant's doctor finding only a five percent disability rating, a mere two percent lower than Jensen's rating given by Dr. Walsh. *Id.* at 1248. The Mississippi Supreme Court declared that "[a] claimant such as Cantrell must make a reasonable effort to secure other comparably gainful employment." *Id.* at 1249. In the instant case, Jensen not only sought other employment, but found work on several occasions where his tasks admittedly did not interfere with his shoulder injury. The court in *Cantrell* further held that

On the evidence, the Commission may have found Cantrell experienced no permanent partial

occupational impairment, in which event his compensation becomes a function of his 5% medical impairment and the statutory directives for scheduled member injuries. Under these circumstances, we must reverse the judgment of the Circuit Court and direct the Commission's order be fully reinstated.

*Id.*

¶18. It is our opinion that Jensen is not entitled to an award of total loss of use of his arm. By the standards offered in *Cantrell*, this Court tends to agree with MPBC in its assertion that Jensen probably received a more generous award from the administrative judge and the Commission than was necessarily merited.

¶19. Because many states, including Mississippi, have not addressed our issue at bar in light of a professional sports setting, this Court has taken the liberty to examine the manner in which some states have considered the calculation of a loss of use when claimed by a professional sports player. One such opinion out of the state of Illinois, dealing with a claimant who was injured while playing professional football, addressed some of the serious concerns in such cases. *Albrecht v. Industrial Commission*, 648 N.E.2d 923, 924 (Ill. App. Ct. 1995). The arbitrator hearing that case determined that although the claimant was "forced to change careers" because of his injury, he was still not entitled to receive an award for total industrial loss. *Id.* Interestingly, the arbitrator further opined that to calculate the industrial loss for such an injury would be difficult in that using other players' earnings as comparable earnings to that of the claimant would be "unfair because no player is guaranteed selection to the team even if he is healthy." *Id.*

¶20. On Albrecht's appeal from the arbitrator's decision, the trial court declared that

From the moment (claimant) started playing football, (claimant) was in a position of temporary employment, not a career where he could anticipate continued employment as long as he desired . . . any presumption that 'but for' his injury claimant could have continued playing football is not applicable . . . [w]here no evidence exists that Petitioner would have continued in his usual and customary line of employment, earning his pre-injury wages, an award of wage differential [or lost wages] is not appropriate.

* * *

[C]laimant here must show that, but for his injury, he would have continued his professional football career as an offensive lineman with the Bears after [his injury]. . . . [T]he test is the capacity to earn . . . . [W]e will not speculate as to what amount claimant would have earned in the years after [his injury].

*Id.* at 925-27. Certainly, one would say that professional baseball could be paralleled to professional football when considering the possible length of a player's employment as a member of a team sport where players are often transposed for others. In light of this decision, we are inclined to say that it would be most difficult to award a claimant involved in professional sports a total loss of use when it cannot be predetermined that the claimant would remain a member of the team even one more day after his injury. The concept that a player of professional team sports may be traded or terminated at the whim of coaches or owners for endless reasons negates the possibility of a court attempting to accurately measure how long a player's compensation should extend.

¶21. Similarly, in the Pennsylvania case of *Station v. Workmen's Compensation Appeal Board*, 608 A.2d 625, 627 (Pa. Commw. Ct. 1992), the court, in computing the claimant's compensation award, declared

"[c]laimant's injury, although sufficient to disable a professional football player, is not likely to preclude a person of Claimant's education from eventually establishing a new and perhaps even more lucrative career in a less physically demanding profession." We believe that Jensen may be equated with the claimant in that case in that he has pursued the education required to move on to a more rewarding profession that would not aggravate his injury.

¶22. The court in *Station* further recognized that, in the arena of professional sports, the occupation of a player is one that is seasonal and uncertain. *Id.* at 630. We find this to be a fair assertion which applies the logic that a professional sports player is never assured that he will still be a part of that team or of professional sports in general from one day to the next. This rationale forces us to pose the inevitable question in the case at bar: How can a one hundred percent total loss of use award be granted for Jensen when there is no certainty in the idea that he would have played professional baseball for 200 weeks, or even the next day, after his injury? This Court will not attempt to engage in speculation as to how long Jensen could have played the game but for his injury. However, there is no evidence which would show us that this career choice by Jensen would have remained an option for him for more than a short-lived period. Therefore, it does not stand to reason that this Court should uphold a total loss of use award for an injury sustained in such an ever-changing profession.

¶23. The subject of workers' compensation benefits for professional athletes who are injured on the job is unchartered territory in our Mississippi courts which, for this case, we discovered a need to explore. This analysis further convinces us to go forward with our decision to reverse the findings of the lower court in this case and serves to supplement our agreement with the Commission that Jensen's recent jobs, activities and education constitute sufficient proof that calls for an award of compensation a great deal more modest than that of a total loss. Accordingly, we uphold the decision of the Commission and reverse the lower court inasmuch as we are persuaded that the Commission based its decision on substantial evidence of which we have reviewed in our above discussion. Thus, this Court reinstates the Commission's decision that Jensen be awarded a twenty-five percent occupational loss of use of his left arm, in the words of the administrative judge, "despite the fact that he has demonstrated that he can earn as much or more working part time while going to college than he was earning as a baseball player at the time of his injury."

¶24. **THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY IS REVERSED AND THE DECISION OF THE COMMISSION IS REINSTATED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**KING, P.J., IRVING, LEE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR. SOUTHWICK, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J., AND IRVING, MOORE, AND PAYNE, JJ.**

SOUTHWICK, P.J., CONCURRING

¶25. The majority determines that former minor league baseball player Blair Jensen is not entitled to benefits based on a total loss of use of a scheduled member. I agree with that conclusion but find that we should acknowledge that several Mississippi Supreme Court precedents could be read to suggest otherwise. In order to explain why our ruling is consistent with the controlling principles in those prior decisions, I write separately.

¶26. One lesser concern is that at times the Court's opinion could be read to blur the distinction between the

"substantial acts of the usual occupation" case law and the principles of total industrial disability. Those distinctions I will attempt to leave intact.

¶27. Jensen is seeking benefits that exceed the medical impairment to a scheduled member. That is a proper endeavor, but it requires proof of an impact on wage-earning capacity that exceeds the medical impairment to the member. A rule has developed for a certain type of loss of use. When a partial loss of use of a scheduled member results in an inability to perform the "substantial acts required of him in his usual occupation," the worker is entitled to the same compensation as for total loss of use of the member. *E.g., Piggly Wiggly v. Houston*, 464 So.2d 510, 512 (Miss. 1985).

¶28. However, this case more starkly than any other precedent presents the issue of a worker fully able to be employed despite the injury, but no longer able to perform the substantial acts of at least one of his most recent jobs. Does language such as from *Piggly Wiggly* actually require that an employer and insurance carrier pay benefits as if there has been a total and permanent loss of use of a scheduled member if that person can no longer perform the old job or anything related? Is that true even though the worker is fully employable at many other and even better paying jobs?

¶29. I find that the present case, which so squarely raises the problem with the language in some of these cases, requires that we be more precise than the precedents have needed to be. To seek the core principle that these precedents are discussing, I review several of them. "Substantial acts of usual employment" is a concept that first appeared in an appeal when the compensation statute was only three years old. The case adopted a general disability insurance standard for workers' compensation use. *M.T. Reed Const. Co. v. Martin*, 215 Miss. 472, 477-78, 61 So.2d 300, 303 (1952) (citing *Lipnick v. New York Life Ins. Co.*, 211 Miss. 833, 838, 52 So. 2d 916, 917 (1951) and *Metropolitan Cas. Ins. Co. v. Cato*, 113 Miss. 283, 74 So. 114 (1917)).

¶30. What this standard means can be revealed by looking at its source. The *insurance policy* in *Cato* provided that if injuries "continuously and wholly disable and prevent the insured from performing any and every kind of duty pertaining to his occupation," benefits for total disability will be awarded. *Cato*, 74 So. at 116. Basically the employee would be entitled to compensation if the chosen occupation is no longer available. The Court then elaborated on the phrase:

> Total disability must, from the necessity of the case, be a relative matter, and must depend largely upon the occupation and employment in which the party insured is engaged.

> One who labors with his hands might be so disabled by a severe injury to one hand as not to be able to labor at all at his usual occupation, whereas a merchant or a professional man might by the same injury be only disabled from transacting some kinds of business pertaining to his occupation.

*Cato*, 74 So. 114, 117 (quoting *Wolcott v. United Life & Accident Ins Co.*, 8 N.Y.S. 263, 264 (1889)). Another quoted case that focused on an inability to perform "the substantial acts required of him in his business," was interpreting a policy covering bodily injury and disease, not scheduled members. *Lipnick,* 52 So. 2d at 917, quoted in *M. T. Reed*, 61 So. 2d at 303.

¶31. Though the original quotations themselves and the insurance precedents from which they were taken were not limited to scheduled member injuries, they did define "occupation" to mean the specific usual employment of the insured. Even so, as the majority in the present case reveals, most of the workers'

compensation precedents also made statements such as it "appears most unlikely that he will be able to pursue any other gainful employment. . . ." *M. T. Reed*, 61 So. 2d at 303; *Lipnick*, 52 So. 2d at 917 ("his physical condition is such that . . . common care and prudence require that he cease all work. . . ."). *See also McGowan v. New Orleans Furniture,* 586 So.2d 163, 168 (Miss. 1991) (claimant's physical limitations and education will make finding any other job difficult); *Piggly Wiggly v. Houston*, 464 So.2d at 513 (unlikely that claimant will be able to pursue other employment); *McManus v. Southern United Ice Co.*, 243 Miss. 576, 582-84, 138 So.2d 899 (1962) (claimant has not worked since injury, is 63 years old and has a 4th grade education); *Tyler v. Oden Construction Co.,* 241 Miss. 270, 273, 130 So. 2d 552 (1961) (due to age and physical condition, unlikely claimant will be able to pursue other employment).

¶32. So what I find undeniable is that in these precedents a claimant because of an injury to a scheduled member, could not perform the usual acts of his customary employment *and also* could not perform meaningful work at all. It is probably important to remember that much of this law developed at the time that compensation benefits for loss of use of a scheduled member were limited to the maximum amount for that member, i.e., 200 weeks for injury to an arm, 175 weeks for loss of use of a leg. Miss. Code Ann. § 71-3-17(c) (1) & (2) (Rev. 1995). Even if a worker could not perform any work at all, if that was because of loss of use of a scheduled member, the worker was limited to the lower benefits that apply to such injuries. *See Smith v. Jackson Construction Co.,* 607 So. 2d 1119, 1126-27 (Miss. 1992). That is no longer the law, as total industrial disability benefits must be paid when appropriate even when the injury is to a scheduled member. *Id.* at 1129.

¶33. That may well mean that the focus on customary employment had something to do with what was then but no longer is an inflexibility in the scheduled member approach. Another basis though, suggested in the quote from *Cato* made above, is that "loss of use" must be put into a context. A national workers' compensation authority has made the same point:

> The trouble with these cases [that do *not* look at a claimant's particular trade] is that they assume that "loss of use" can be mechanically measured in relation to use by some hypothetical claimant. They assume, in other words, that the concept of "loss of use" of the hand has some fixed uniform content as to all human beings, regardless of age, sex, skill, or anything else. But the very word "use" immediately raises the question: use for what? For assembling electronic equipment? For delivering a karate chop? For threading a needle? For holding a pencil? For lifting a bale of cotton? These are all "uses," after all.

4 Arthur Larson, Larson's Workers' Compensation Law 86-21 (1999) § 86.04[5].

¶34. Our statute permits recovery for partial or total loss of use of a scheduled member. Miss. Code Ann. § 71-3-17 (c) (22) & (23) (Rev. 1995). As Professor Larson indicates, this requires determining just what uses have been lost. To determine the relevant uses, the Commission must look at occupations in which the worker has for some reasonably recent time been employed. The "use" is not only those of the precise job at the time of injury, but can include other ones as well. If the worker was a manual laborer, then within a reasonable breadth of jobs requiring those skills, has the injury caused him to be unemployable? The fact that he worked for a specific company in a specific kind of manual labor does not limit the range of substantial acts of usual occupation just to the ones performed at that company. Of course, if the injury has caused him to be unemployable, then he is entitled to benefits outside of the scheduled member scheme. *Smith Construction v. Jackson Constr. Co.,* 607 So.2d at 1128, (Miss. 1992).

¶35. For Blair Jensen, the evidence reasonably interpreted indicates that he was not only a minor league baseball player. As the majority opinion sets out, there were other entirely different employments that he had and likely in the future would have had even without the injury. As a matter of decided preference if not distinct probability, Jensen's part-time occupation as a baseball player could have led to greater things. The majority has discussed how other states have addressed the unique issues that arise with occupations that have these sorts of uncertainties. More generically, though, I find that an injured worker's inability to continue in one of his several occupations does not invoke the "substantial acts" doctrine if there are other of his occupations that are still manageable. That is true at least when as here the income from other usual occupations is equivalent or greater than for the relinquished one. Workers' compensation benefits, after all, can only be substitutes for the lost income and not for other aspects of the employment.

¶36. One final perspective on this case law comes from examining what the supreme court has said is the evidence needed to prove a claim such as Jensen makes here. One claimant was diagnosed with a five per cent medical impairment to his hand. *Walker Mfg. v. Cantrell*, 577 So. 2d 1243, 1248 (Miss. 1991). The claimant Cantrell sought greater benefits by testifying that this hand injury had made him unable to "perform the substantial acts of his employment. . . ." *Id.* at 1245, 1248. The supreme court upheld the Commission's limiting him to a five per cent partial loss of use of his hand for these reasons:

> a) Cantrell offered no evidence that he attempted "to perform his usual duties. . . . There is nothing in the record suggesting that following his recuperation from his last surgery Cantrell attempted, with Walker Manufacturing or any other employer, to perform duties like . . . those he was performing prior to his injury back on September 9, 1985." *Id.* at 1248.

> b) Second, there was no witness who corroborated that he could not perform "the usual duties of his customary employment." *Id.* Cantrell's testimony was the sole support of his claim.

> c) Finally, the Commission stated that there was no evidence that he had been "refused employment based upon the disability to his hand." *Id.* "A claimant such as Cantrell must make a reasonable effort to secure other comparably gainful employment. The law does not require that he move to another part of the state, but he must cast his eyes further than across the street. . . . The Commission was within its prerogatives when it interpreted Cantrell's proof as failing to establish that he was refused comparably gainful employment because of the disability to his hand." *Id.* at 1249.

¶37. This last item is unusual for a scheduled member injury case. A requirement of looking for other work does not usually appear in such case law. Another precedent permitted recovery for total loss of occupational use of the claimant's leg even though he had not looked for another job. *McGowan*, 586 So.2d at 168. McGowan was severely limited by his leg injury and no longer could perform a large number of the requirements of his former job. The Court also said that there were few jobs of any sort that he could likely find, so a search could have been seen as futile. *Id.*

¶38. Though *McGowan* and *Walker Mfg.* could be viewed as inconsistent on the need to show a failed effort to search for other work, they fit together coherently if the statement in *Walker Mfg.* that such a claimant *must* seek other work is moderated. What in essence both mean is that when a claimant seeks benefits based on an enhanced occupational effect of an injury to a scheduled member, a variety of evidence is relevant to whether in fact the claimant is unable to perform the substantial acts of the employment. I find that *Walker Mfg.* sustains the view expressed here, that a worker making this claim must convince the Commission that employment comparable to his occupation prior to the time of injury

was no longer attainable. He might not have to prove that he actually looked since that is what *McGowan* said was unnecessary. Yet he must present relevant evidence that he could not perform the jobs within his normal occupation -- or occupations. That in turn can be countered by relevant evidence discrediting his factual assertions.

¶39. I agree with the majority's resolution of this appeal. I offer what in my view is a clarification of the existing scheduled member case law. This rule upon which Jensen relies did not begin as and should not become an obligation for an employer to pay based on the arbitrary coincidence of whether a generally healthy worker after a job-related injury can still perform that precise job anymore. Where to place all the limits will develop as more such cases are decided. One of the limits arises from this appeal.

¶40. I am aware of the lost possibilities in Jensen's preferred occupation. However, insofar as worker's compensation law can provide, the benefits awarded here compensate him for the injury that he suffered.

**McMILLIN, C.J., IRVING, MOORE AND PAYNE, JJ., JOIN THIS SEPARATE OPINION.**