CHARLES H. SMITH, III, Employee, Plaintiff v. RICHARDSON SPORTS LTD. PART-
NERS d/b/a CAROLINA PANTHERS, Employer; LEGION INSURANCE COMPANY,
Carrier, Defendants

No. COA03-1130

(Filed 15 February 2005)

**1. Workers' Compensation— professional football player—
dollar-for-dollar credit**

The Industrial Commission did not err in a workers' compen-
sation case involving plaintiff injured professional football player
by concluding that defendant employer was not entitled to a dol-
lar-for-dollar credit for the amounts paid to plaintiff after his
injury, because: (1) N.C.G.S. § 97-42 provides that any credit
awarded to an employer for any amount paid to an employee
after his injury is limited to shortening of the period in which
compensation is paid, and not by reducing the amount of the
weekly payment; (2) the North Carolina Workers' Compensation
Act precludes a dollar-for-dollar credit and prohibits contractual
modification of the workers' compensation statutory provisions;
and (3) the NFL players' contract has been interpreted to provide
for a time credit and not a dollar-for-dollar credit.

**2. Workers' Compensation— professional football player—no
credit for payments due and payable—roster bonus—sign-
ing bonus—minicamp—workout—appearance fees**

The Industrial Commission did not abuse its discretion in a
workers' compensation case involving plaintiff injured profes-
sional football player by concluding that defendant employer was
not entitled to a greater credit for five of the payments received
by plaintiff post-injury including one of the fifteen payments of
$47,059 paid during the 2000 season, the $1,000,000 roster bonus
of 3 April 2001, the $1,985.72 paid for workouts and mini-camps
in 2001, a $2,500 appearance fee for 7 March 2001, and the
$4,500,000 signing bonus, because: (1) N.C.G.S. § 97-42 provides
that payments made by the employer which were due and payable
when made are not deductible, and the pertinent five payments
had been earned by plaintiff and were due and payable when
made; and (2) the 18 September 2000 $47,059 payment was for
services rendered during the prior week, including the 17
September 2000 game in which plaintiff was injured.

SMITH v. RICHARDSON SPORTS LTD. PARTNERS

[168 N.C. App. 410 (2005)]

### 3. Workers' Compensation— professional football player— credit for payments—additional findings of fact necessary

The Industrial Commission erred in a workers' compensation case involving plaintiff injured professional football player by concluding that defendant employer was not entitled to a greater credit for payments including the $225,000 injury protection provision payments paid during the 2001 regular season, the $750,000 one year skill and injury guarantee payments paid in 2002, and the injured reserve pay of fourteen $47,059 installments in 2000, and the case is remanded for further findings on these payments because: (1) the determination that the injury protection plan payments were from an employee-funded plan was not supported by competent evidence; (2) although the parties stipulated that plaintiff would receive $750,000 in seventeen equal payments during the 2002 football season, the Commission did not render any findings of fact or conclusions of law as to whether it would award defendants a credit for these payments; and (3) on remand, the Commission may hear additional evidence and may make further findings of fact as to whether the effect of N.C.G.S. § 97-42 has been modified in this case regarding the injured reserve pay.

### 4. Workers' Compensation— professional football player— post-injury wage earning capacity

The Industrial Commission did not err in a workers' compensation case involving plaintiff injured professional football player by concluding that plaintiff's post-injury wage earning capacity outside the NFL is $40,000 per year during the relevant 300-week period covered by N.C.G.S. § 97-30, because: (1) plaintiff's uncontradicted testimony that he was making $40,000 a year was competent evidence upon which the Commission could determine plaintiff's wage-earning capacity; and (2) if plaintiff's income changed and plaintiff began making more than $40,000 a year during the 300-week period, such that he was no longer entitled to the maximum compensation rate, defendants could move to terminate or diminish the amount of compensation pursuant to N.C.G.S. § 97-47.

Appeal by defendants from an opinion and award entered 3 June 2003 by the North Carolina Industrial Commission. Heard in the Court of Appeals 7 June 2004.

*R. James Lore for plaintiff-appellee.*

*Hedrick, Eatmon, Gardner & Kincheloe, L.L.P., by Hatcher Kincheloe and Shannon P. Herndon, for defendant-appellants.*

HUNTER, Judge.

Richardson Sports Ltd. Partners, d/b/a The Carolina Panthers, et al. ("defendants") present the following issues for our consideration: whether the North Carolina Industrial Commission ("Commission") erred in (I) only allowing defendants a fourteen-week credit, with an approximately $8,000.00 value, for approximately six million dollars in post-injury payments to plaintiff and not allowing a dollar-for-dollar credit for the total amount paid to plaintiff post-injury,[1] (II) awarding plaintiff an automatic right to receive 300 weeks of partial disability benefits, and (III) finding that the $225,000.00 paid to plaintiff pursuant to a contractual injury protection plan represents payments made from revenue designated as "employee revenue" and not funded by the defendants. We affirm the opinion and award in part and remand this case to the Commission for the reasons stated herein.

This is a rare case in which a highly paid individual suffered a compensable injury and occupational disease and received several millions of dollars after his injury pursuant to his employment contract. Charles H. Smith, III ("plaintiff"), entered into a contract with defendants on 1 March 2000 to play professional football for the Carolina Panthers ("Panthers") of the National Football League ("NFL"). The contract was scheduled to end on 28 or 29 February 2005, unless the contract was terminated, extended, or renewed as specified by the contract. The contract provided that defendants would pay plaintiff (1) $800,000.00 for the 2000 season, (2) $1,500,000.00 for the 2001 season, (3) $2,700,000.00 for the 2002 season, (4) $3,500,000.00 for the 2003 season, and (5) $4,000,000.00 for the 2004 season. In addition to the salary, plaintiff would receive financial bonuses such as a $4,500,000.00 signing bonus, a $1,000,000.00 roster bonus for each season he was placed on the team's roster starting in 2001, and payments for making public

---

1. Our calculation of the sum of the payments for which defendants seek a credit does not equal $6,172,135.40. We also note that some of the stipulated exhibits do not equal some of the amounts stated by defendants in their briefs. However, we choose to use the numbers and figures used by the parties in their brief for the sake of clarity. If necessary, on remand the parties and the Commission may address any discrepancies.

appearances and attending the team minicamps and workouts. A one-year skill and injury guarantee addendum to the contract provided plaintiff would receive $750,000.00 in 2002 if the team determined plaintiff's skill for performance was unsatisfactory when compared with other players competing for positions on the roster or if plaintiff was unable to pass the team's 2002 preseason physical due to a football-related injury occurring prior to the 2002 season. The Collective Bargaining Agreement ("CBA") between the NFL clubs and the NFL Players Association was also a part of plaintiff's contract, and it contained several benefits, including an injury protection provision. Under certain conditions, this provision provides a one-time benefit to injured players during the season after a player's injury. Plaintiff received $225,000.00 under this provision.

Prior to entering into a five-year contract with defendants, plaintiff played football for four years in college and played with the Atlanta Falcons ("Falcons") of the NFL from 1992 until 2000. With the Falcons, plaintiff received awards, including being voted greatest defensive lineman in Falcon history, being selected to the All-Pro Bowl NFL team, and being chosen as co-captain in Super Bowl XXXIII. While playing for the Falcons, plaintiff sustained a knee injury and had knee reconstruction surgery in 1994. He only missed one game with the Falcons related to that injury.

After joining the Panthers in 2000, plaintiff passed the pre-employment physical examination performed by defendants' physician, which made him eligible to play football. After passing the physical examination, defendants allowed plaintiff to undergo another surgical procedure to get his knee "cleaned out." Plaintiff continued rehabilitation treatment and attended practices sporadically. After playing the first two games of the season, plaintiff sustained another knee injury during the third game on 17 September 2000, and plaintiff was placed on injured reserve. While on injured reserve, plaintiff continued to receive his salary. During the 2000 season, plaintiff was paid $800,000.00 in installments of $47,059.00 for seventeen weeks. Three of these installment payments were for the three games in which plaintiff played, including the third game in which he was injured. The remaining fourteen installment payments, totaling $658,826.00, was injured reserve pay.

Plaintiff had knee surgery towards the end of the 2000 regular football season. Defendants decided to place plaintiff on its 2001 roster. As a result, plaintiff received a $1,000,000.00 roster bonus in April

2001. From 2 April 2001 to 21 May 2001 plaintiff participated in mini-camps, workouts, and training camps, for which plaintiff was paid $1,985.72. Plaintiff also made appearances during this time period, for which defendants paid him $2,500.00. On 23 July 2001, plaintiff's contract was terminated by defendants due to unsatisfactory skill or performance as compared with that of other players competing for positions on the club's roster. Defendants paid plaintiff $87,500.00 in severance pay, an amount based on his years of service with the NFL. As the conditions of the contractual injury protection provision were met, plaintiff also received $225,000.00 in installments during the 2001 regular season. In 2002, plaintiff received $750,000.00 pursuant to the one year skill and injury guarantee addendum to his contract.

At the time of the Commission's review, plaintiff earned $40,000.00 per year as a radio announcer for 790 Zone Radio in Atlanta, Georgia. If it had not been for the injury, he would have had the capacity to earn at least $20,000,000.00 under the contract, which included the signing bonus of $4,500,000.00, his salary each year, and his projected roster bonus each year. In the Pre-trial Agreement, defendants agreed to pay $588.00 per week, the maximum workers' compensation rate in effect for 2000, until the hearing.

Defendants denied plaintiff's injury was compensable by filing a Form 61 with the Commission on 11 October 2001. Thereafter, on 5 March 2002, defendants filed a Form 60 admitting compensability. The parties then proceeded before the deputy commissioner regarding the amount of workers' compensation, if any, to which plaintiff was entitled. Defendants argued they were entitled to credits for post-injury payments made to plaintiff. In a 1 July 2002 opinion and award, Deputy Commissioner Phillip A. Holmes determined plaintiff was entitled to 300 weeks of compensation at a rate of $588.00 per week. Defendants were awarded a fourteen week credit. Thus, plaintiff was awarded compensation at the rate of $588.00 per week for 286 weeks and medical expenses. On appeal, the Commission affirmed the opinion and award with some modifications. The Commission concluded "[p]laintiff sustained a compensable injury by accident and developed compensable occupational disease(s) as a result of an admittedly compensable event arising out of and in the course of his employment with defendants on September 17, 2000." In the award, plaintiff was awarded partial disability compensation of $588.00 for 300 weeks with a fourteen-week credit to defendants. This would result in a total award of $168,168.00. Plaintiff was also awarded payment for past

and future medical coverage for injuries, diseases, and conditions resulting from the injury. Defendants appeal.[2]

Defendants assert that they are entitled to a greater credit than that awarded by the Commission. Specifically, defendants contend they should have been awarded either a period credit or dollar-for-dollar credit for the following payments:

- fifteen payments of $47,059.00 totaling $705,885.00 paid during the 2000 season post-injury,

- $1,000,000.00 roster bonus paid on 3 April 2001,

- $1,985.72 paid in 2001 for workouts and mini-camps,

- a $2,500.00 appearance fee paid on 7 March 2001,

- $225,000.00 in injury protection payments for the 2001 season,

- $750,000.00 paid during the 2002 season pursuant to the One-Year Skill and Injury Guarantee which is Addendum C to the 2001 contract, and the

- $4,500,000.00 signing bonus.

We first address defendants' contention that they were entitled to a dollar-for-dollar credit for the above amounts paid to plaintiff post-injury.

[1] Defendants contend they are entitled to a dollar-for-dollar credit because this Court has previously affirmed a dollar-for-dollar credit in

---

2. We initially note that defendants have not appealed the Commission's computation of the average weekly wage. In its conclusions of law, the Commission determined that exceptional reasons existed for using an alternative method to calculate plaintiff's average weekly wage in order to most accurately approximate the amount which plaintiff would have earned but for the injury or disease he sustained. *See Larramore v. Richardson Sports Ltd. Partners*, 141 N.C. App. 250, 540 S.E.2d 768 (2000), *per curiam aff'd*, 353 N.C. 520, 546 S.E.2d 87 (2001). Defendants, however, do state in their brief's statement of facts, that the Commission's determination that plaintiff would have earned $20,000,000.00 under the entire contract was speculative, as there was no guarantee plaintiff would have made the team each year. Our appellate rules indicate that the statement of facts "should be a non-argumentative summary of all material facts underlying the matter in controversy[.]" N.C.R. App. P. 28(b)(5). As defendants did not properly argue this issue in their brief, we will consider this assignment of error abandoned. *See* N.C.R. App. P. 28(b)(6) ("[a]ssignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned"). However, even assuming this issue was properly argued, our review of the record indicates competent evidence supports the findings of fact regarding what plaintiff would have earned under the contract.

*Larramore*, a workers' compensation case involving a professional football player. *See Larramore v. Richardson Sports Ltd. Partners*, 141 N.C. App. 250, 540 S.E.2d 768. In *Larramore*, however, this Court did not address the issue of whether an employer was entitled to a dollar-for-dollar credit for the amounts paid to an employee after his injury. Moreover, this Court does not even discuss a dollar-for-dollar credit in *Larramore*. The only reference to a credit in *Larramore* is in this Court's summary of the Commission's opinion and award. This Court stated: "The Commission calculated plaintiff's average weekly wage as $1,653.85, yielding a weekly compensation rate of $478.00, minus appropriate credits to defendants." *Id.* at 253, 540 S.E.2d at 770. Accordingly, we conclude this Court's opinion in *Larramore* does not hold an employer is entitled to a dollar-for-dollar credit for any amounts paid to an employee after his injury. Rather, this issue is governed by N.C. Gen. Stat. § 97-42 (2003).

N.C. Gen. Stat. § 97-42 states:

Payments made by the employer to the injured employee during the period of his disability, or to his dependents, which by the terms of this Article were not due and payable when made, may, subject to the approval of the Commission be deducted from the amount to be paid as compensation. Provided, that in the case of disability such deductions shall be made by shortening the period during which compensation must be paid, and not by reducing the amount of the weekly payment. Unless otherwise provided by the plan, when payments are made to an injured employee pursuant to an employer-funded salary continuation, disability or other income replacement plan, the deduction shall be calculated from payments made by the employer in each week during which compensation was due and payable, without any carry-forward or carry-back of credit for amounts paid in excess of the compensation rate in any given week.

Thus, any credit awarded to an employer for any amount paid to an employee, after his injury, is limited to shortening of the period in which compensation is paid, under the restrictions set forth in N.C. Gen. Stat. 97-42, and not by reducing the amount of the weekly payment.[3]

Nonetheless, defendants argue that they are entitled to a dollar-for-dollar credit pursuant to their contract with plaintiff. Paragraph 10 of the NFL Player Contract entered into by the parties states:

---

3. See *infra* for a discussion of the 1994 amendments to this statute.

**SMITH v. RICHARDSON SPORTS LTD. PARTNERS**

[168 N.C. App. 410 (2005)]

> WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

Defendants argue that this contractual provision "specifically sets forth that the types of payments that were made to Employee-Plaintiff in this action are deemed advances against any award of workers' compensation." In support of this contention defendants cite *Pittsburgh Steelers Sports, Inc. v. Workmen's Compensation Appeal Board*, 604 A.2d 319 (Pa. 1992) and *Station v. Workmen's Compensation Appeal Board*, 608 A.2d 625 (Pa. 1992). In *Steelers* and *Station*, the Commonwealth Court of Pennsylvania explained the Workmen's Compensation Board should have determined the credit owed to the professional football team for payments made to an injured player on a dollar-for-dollar basis. *See Steelers*, 604 A.2d at 323; *Station*, 608 A.2d at 632. In each of these decisions, the Pennsylvania court based its decision upon Paragraph 10 of the NFL Player Contract. *Steelers*, 604 A.2d at 322-23; *Station*, 608 A.2d at 632.[4]

While the same contractual provision is present in this case, *Station* and *Steelers* do not provide relevant guidance. First, in North Carolina, N.C. Gen. Stat. § 97-42 does not allow a credit to be given by reducing the amount of the weekly payment. Rather, the number of weeks in which a claimant receives workers' compensation should be shortened. Our review of the Pennsylvania statutes does not reveal a similar provision.[5] Second, North Carolina statutes provide: "No con-

---

4. The Pennsylvania decisions in *Steelers* and *Station* were decided prior to the arbitration decision indicating any credit under paragraph 10 of the NFL contract would be imposed on a time basis. The NFL CBA indicates each NFL team is bound by arbitration decisions. For further discussion, *see infra*.

5. After the Pennsylvania decisions in *Station* and *Steelers*, the Pennsylvania legislature enacted legislation applicable to highly paid professional athletes which limited workers' compensation benefits. *See* 77 P.S. § 565 (2004). This legislation makes a distinction between highly paid professional athletes and athletes that do not earn high salaries. *See Lyons v. Workers' Comp. Appeal Bd.*, 803 A.2d 857 (Pa. 2002). North Carolina has not enacted similar legislation.

tract or agreement, written or implied, no rule, regulation, or other device shall in any manner operate to relieve an employer in whole or in part, of any obligation created by this Article, except as herein otherwise expressly provided." N.C. Gen. Stat. § 97-6 (2003). Thus, the North Carolina Workers' Compensation Act precludes a dollar-for-dollar credit and prohibits contractual modification of the workers' compensation statutory provisions. *See Hoffman v. Truck Lines, Inc.*, 306 N.C. 502, 507-08, 293 S.E.2d 807, 811 (1982) (stating "an employer would not be permitted to escape his liability or obligations under the Act through the use of a special contract or agreement if the elements required for coverage of the injured individual would otherwise exist").

Moreover, in *In the Matter of an Arbitration between National Football League Players Association and National Football League Management Council,* Opinion and Decision of Sam Kagel, National Arbitrator (28 December 1994), the arbitrator determined Paragraph 10 of the NFL Players Contract was

> designed to avoid "double dipping" by a Player in a case where the Player is receiving a salary or injury protection compensation and is also receiving Workers' Compensation by providing that the Club can offset Workers' Compensation payments against such salary or injury protection payments.

> The "period" during which such offsets can be made by the Club is the period of salary payments or the period related to the injury protection period. . . .

*See Arbitration* at 19. Thereafter, the arbitrator decided the Club was entitled to an "offset on a time basis." *Id.* The NFL CBA indicates that each NFL club is bound by arbitration decisions. Article IX, Section 8 of the NFL CBA states in pertinent part: "The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement . . . ." As the Panthers are a party to the CBA, they are bound by the arbitrator's decision that Paragraph 10 of the Players' contract provides for an offset on a time basis. Therefore, not only does North Carolina law preclude a dollar-for-dollar credit, the NFL Players' contract has been interpreted to provide for a time credit and not a dollar-for-dollar credit.

[2] We next consider defendants' arguments that they were entitled to a greater credit than that awarded by the Commission. In its award,

**SMITH v. RICHARDSON SPORTS LTD. PARTNERS**

[168 N.C. App. 410 (2005)]

the Commission granted defendants a credit for fourteen weeks of compensation payments at the weekly rate of $588.00, to be deducted from the end of the 300-week period. As previously stated, defendants contend they should have been awarded a credit for the following payments:

- fifteen payments of $47,059.00 totaling $705,885.00 paid during the 2000 season post-injury,

- $1,000,000.00 roster bonus paid on 3 April 2001,

- $1,985.72 paid in 2001 for workouts and mini-camps,

- a $2,500.00 appearance fee paid on 7 March 2001,

- $225,000.00 in injury protection payments for the 2001 season,

- $750,000.00 paid during the 2002 season pursuant to the One-Year Skill and Injury Guarantee which is Addendum C to the 2001 contract, and the

- $4,500,000.00 signing bonus.

Whether an employer is awarded a credit for payments made to an employee post-injury is governed by N.C. Gen. Stat. § 97-42, which states:

Payments made by the employer to the injured employee during the period of his disability, or to his dependents, which by the terms of this Article were not due and payable when made, may, subject to the approval of the Commission be deducted from the amount to be paid as compensation. Provided, that in the case of disability such deductions shall be made by shortening the period during which compensation must be paid, and not by reducing the amount of the weekly payment. Unless otherwise provided by the plan, when payments are made to an injured employee pursuant to an employer-funded salary continuation, disability or other income replacement plan, the deduction shall be calculated from payments made by the employer in each week during which compensation was due and payable, without any carry-forward or carry-back of credit for amounts paid in excess of the compensation rate in any given week.

For an employer to receive a credit under this statute (1) the payment must not have been due and payable, and (2) the Commission must decide, in its discretion, whether to award a credit. If the Commission

decides to award a credit, the credit is awarded by shortening the number of weeks for which the claimant receives compensation. The employer is not entitled to a dollar-for-dollar credit. If the payment was made pursuant to an employer funded disability plan, different rules may apply.

N.C. Gen. Stat. § 97-42 "expressly provides that payments made by the employer which were 'due and payable' when made are not deductible." *Moretz v. Richards & Associates*, 316 N.C. 539, 541, 342 S.E.2d 844, 846 (1986); *see also Thomas v. B.F. Goodrich*, 144 N.C. App. 312, 318-19, 550 S.E.2d 193, 197 (2001) (stating "[i]f payments made by an employer are due and payable, the employer may not be awarded a credit for the payments under section 97-42"). Our appellate courts have determined there are at least three instances where a payment is "due and payable." First, a payment is due and payable when the Commission has entered an opinion awarding benefits to a claimant. *See Foster v. Western-Electric Co.*, 320 N.C. 113, 115, 357 S.E.2d 670, 672 (1987). Second, a payment is due and payable after the employer has admitted the worker's injury is compensable and therefore entitled to workers' compensation benefits.[6] *Moretz*, 316 N.C. at 541-42, 342 S.E.2d at 846. As explained by our Supreme Court in *Moretz*,

> [t]he Workers' Compensation Act provides that a policy insuring an employer against liability arising under that Act must contain an agreement by the insurer to pay promptly all benefits conferred by its provisions, and that such agreement is to be construed as a direct promise to the person entitled to compensation. N.C.G.S. § 97-98 (1985). By virtue of this promise, once the employer has accepted an injury as compensable, benefits are "due and payable." *See also* N.C.G.S. § 97-18(b) (1985). Because defendants accepted plaintiff's injury as compensable, then initiated the payment of benefits, those payments were due and payable and were not deductible under the provisions of section 97-42, *so long as* the payments did not exceed the amount determined by statute or by the Commission to compensate plaintiff for his injuries.

---

6. Plaintiff was injured on 17 September 2000. Although the parties stipulated that defendants admitted compensability by filing a Form 60 with the Commission, the record indicates the Form 60 was not filed until 5 March 2002. The record also indicates that defendants initially denied compensability by filing a Form 61 on 10 October 2001. On remand, the Commission should determine whether any of the payments for which defendants seek a credit were due and payable when made.

*Id.* Thus, if the payments exceed the amount to which the plaintiff is entitled, the employer will not have to pay any additional compensation. *See id.* at 542, 342 S.E.2d at 847 (stating the employer did not have to pay any additional compensation because the plaintiff had already been fully compensated for his injury). Third, a payment is due and payable when made if the employee has earned the compensation or benefit. In *Christopher v. Cherry Hosp.*, 145 N.C. App. 427, 550 S.E.2d 256 (2001), the employer denied the employee's workers' compensation claim and the injured employee used fifty-two days of accrued sick leave and vacation leave while she was out of work. *Christopher*, 145 N.C. App. at 427, 550 S.E.2d at 257. This Court explained that "an employee's accumulated vacation and sick leave could be used by the plaintiff for purposes other than those served by the [Workers' Compensation] Act, [and] were not tantamount to workers' compensation benefits." *Id.* at 430, 550 S.E.2d at 258. We further explained that:

> "Such benefits have nothing to do with the Workers' Compensation Act . . . . [P]laintiff in the instant case cannot be held to have received duplicative payments for his injury or to have received more than he was entitled by the Workers' Compensation Act to receive."

*Id.* (citation omitted). Based upon our analysis, we held in *Christopher* "that payments for such vacation and sick leave are 'due and payable' when made because they have been earned by the employee and are not solely under the control of the employer." *Id.* at 432, 550 S.E.2d at 260.

> When, however, an employer makes payments that are not due and payable, the Commission may in its discretion award the employer a credit for the payments pursuant to section 97-42. . . . Thus, this Court's review of the Commission's decision to grant or deny a credit for payments made by an employer that were not due and payable "is strictly limited to a determination of whether the record affirmatively demonstrates a manifest abuse of discretion" by the Commission.

*Thomas*, 144 N.C. App. at 319, 550 S.E.2d at 197 (footnote omitted).

When a credit is awarded, the deduction "shall be made by shortening the period during which compensation must be paid, and not by reducing the amount of the weekly payment." N.C. Gen. Stat. § 97-42. Thus, any credit awarded to defendants may not result in the re-

duction of the $588.00 weekly rate of compensation. Rather, the number of weeks in which plaintiff receives compensation would be shortened.

However, if the payment was made pursuant to an employer-funded salary continuation, disability, or other income replacement plan, different rules may apply. In *Foster v. Western-Electric Co.*, 320 N.C. 113, 357 S.E.2d 670, our Supreme Court indicated that if an employer pays an employee wage-replacement benefits at a time when workers' compensation benefits are not due and payable, the employer is entitled to a credit. Allowing a credit for these payments is in accord with the public policies behind our Workers' Compensation Act, i.e., "to relieve against hardship," "to provide payments based upon the actual loss of wages[,]" and the avoidance of "duplicative payments." *Id.* at 116-17, 357 S.E.2d at 673.

In *Evans v. AT&T Technologies*, 332 N.C. 78, 418 S.E.2d 503 (1992), our Supreme Court indicated that the credit for payments made pursuant to an employer-funded wage replacement plan should be a dollar-for-dollar credit. In response to this holding, the General Assembly amended N.C. Gen. Stat. § 97-42 in 1994 to add the following provision:

> Unless otherwise provided by the plan, when payments are made to an injured employee pursuant to an employer-funded salary continuation, disability or other income replacement plan, the deduction shall be calculated from payments made by the employer in each week during which compensation was due and payable, without any carry-forward or carry-back of credit for amounts paid in excess of the compensation rate in any given week.

The statute "was amended to modify the decision of the Supreme Court [of North Carolina] in *Evans v. AT&T Technologies*, 332 N.C. 78, 418 S.E.2d 503 (1992), which provided a dollar-for-dollar credit against workers' compensation due for payments received under an employer-funded disability program." Henry N. Patterson, Jr. and Maxine Eichner, *1994 Workers' Compensation Reform Act*, pp. 27-28.

> Under the new language, unless otherwise provided by the plan, payments made under an employer-funded salary continuation, disability or other income replacement plan will be deducted from payments due from the employer in each week during which compensation is payable "without any carry-forward or carry-

back for credit for amounts paid in excess of the compensation rate in any given week." The employer, therefore, is now entitled only to a credit against compensation payable for weeks during which the employer-funded disability benefits were paid unless otherwise provided in the employer's disability plan.

*Id.* Therefore, under N.C. Gen. Stat. § 97-42, any credit an employer receives for payments made pursuant to an employer-funded salary continuation, disability, or other income replacement plan is awarded by reducing the number of weeks of workers' compensation awarded to the claimant by the number of weeks in which an employer made payments under the plan, if the payments were not due and payable when made. If the payment made by the employer was more than what the employee was to receive under the Workers' Compensation Act, the excess cannot be used towards an additional week of credit. However, the language "[u]nless otherwise provided by the plan" indicates an employer may include language in the wage-replacement plan which modifies the application of this amendment to N.C. Gen. Stat. 97-42.

In this case, our review of the record indicates that five of the payments received by plaintiff post-injury had been earned by the plaintiff, and were due and payable when made. Thus, defendants cannot seek a credit for these five payments: (1) one of the fifteen payments of $47,059.00 paid during the 2000 season, (2) the $1,000,000.00 roster bonus paid on 3 April 2001, (3) $1,985.72 paid in 2001 for workouts and mini-camps, (4) a $2,500.00 appearance fee paid on 7 March 2001, and (5) the $4,500,000.00 signing bonus.

### 1. The $47,059.00 Payment Received in 2000

Plaintiff was injured on 17 September 2000 and the next day, on 18 September 2000, the plaintiff received $47,059.00. In finding of fact 16, the Commission found in pertinent part: "The payment made on September 18, 2000, represented earnings for playing in the September 17, 2000, game in which plaintiff was injured, and was not paid as a disability payment." According to Article XXXVIII, Section 9 of the NFL CBA: "Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. . . ." Plaintiff's payment history indicates he was receiving his salary weekly. As the CBA indicates a player would begin receiving his salary weekly after the first regular season game, the

**SMITH v. RICHARDSON SPORTS LTD. PARTNERS**

[168 N.C. App. 410 (2005)]

Commission's conclusion that the 18 September 2000 payment reflected plaintiff's earnings for playing in the 17 September 2000 game is supported by competent evidence, as the players were paid after the weekly football game. Thus, defendants cannot seek a credit for this payment because it was due and payable when made.[7]

### 2. The $1,000,000.00 Roster Bonus Paid in 2001

Defendants seek a credit for the $1,000,000.00 roster bonus paid on 3 April 2001. In finding of fact 19, the Commission found in pertinent part:

> The roster signing bonus of $1,000,000.00 paid April 3, 2001, to plaintiff was the result of a unilateral decision on the part of the Panthers to place plaintiff on the 2001 roster, most likely to keep him from being picked up by another team if he had been able to recover from his injury and play again. This payment is deemed as earnings to plaintiff.

Paragraph 27 of Addendum B to plaintiff's Player Contract states:

> If Player is a member of the 80-man roster on the following dates of the respective seasons below, he will be paid as follows:
>
> April 1, 2001—$1,000,000 payable April 1, 2001.
>
> March 1, 2002—$1,000,000 payable March 1, 2002.
>
> March 1, 2003—$1,000,000 payable March 1, 2003.
>
> March 1, 2004—$1,000,000 payable March 1, 2004.

Thus, plaintiff was contractually entitled to the $1,000,000.00 roster bonus when the Panthers decided to place him on the roster for the 2001 season. In explaining the decision to place plaintiff on the roster and to reduce plaintiff's salary from $1,500,000.00 to $500,000.00 for the 2001 season, Marty Hurney, General Manager for the Panthers, testified:

> Q. . . . Did you have any part in the consideration of that renegotiation of the contract?
>
> A. Yes, sir.
>
> Q. Why did that occur?

---

7. For a discussion of the remaining installment payments which constituted injured reserve pay, *see infra.*

SMITH v. RICHARDSON SPORTS LTD. PARTNERS

[168 N.C. App. 410 (2005)]

A. Because we wanted to give Chuck extra time to rehab from the injury, to see if—see if he could get healthy enough to play for us, since we had invested money into him, to play for us over a long term. And his salary cap number was too high to keep him. We had a March roster that we had to pay in consideration for him to play for us that year, and we asked him to reduce his Paragraph 5 salary by a million dollars.

Q. What would be the incentive for him to reduce it by a million dollars?

A. To get a chance to still play for us, and to receive the million-dollar roster bonus that was part of that contract to play for us that season.

Q. So if he had not been accepted onto the team in March of 2001, what would have happened to the roster bonus that would have otherwise been payable?

A. Well, if we would have released him before March 1, he wouldn't have received a roster bonus.

The general manager's testimony indicates that the roster bonus was neither paid as a result of plaintiff's workers' compensation claim nor was it a part of a wage replacement plan for employees unable to work. Rather, plaintiff was contractually entitled to the bonus because the Panthers decided to place him on the roster. Thus, the Commission's finding that the bonus should be classified as earnings is supported by competent evidence. As this bonus was due and payable, defendants cannot seek a credit for the roster bonus as it was due and payable when made.

### 3. and 4. The $1,985.72 Payment for Mini-Camps and Workouts and the $2,500.00 Appearance Fee

In finding of fact 15, the Commission found:

Post injury payments in the sum of $4,805.72 were made to plaintiff during the period of April 2, 2001, to May 21, 2001, for plaintiff's participation in the Workout, MiniCamp and Training Camps, as well as an Appearance Fee pursuant to his contract. These payments constitute post-injury earnings.

Plaintiff's payment history indicates he received six $320.00 payments between 2 April 2001 and 21 May 2001 for workouts, one payment of $385.72 for minicamp, and $2,500.00 on 7 May 2001 for an appearance.

**SMITH v. RICHARDSON SPORTS LTD. PARTNERS**

[168 N.C. App. 410 (2005)]

According to plaintiff's contract, he was obligated to participate in minicamps, workouts, and to make appearances on behalf of the team. As plaintiff's payment history indicates these payments between 2 April and 21 May 2001 were for participating in these activities, the Commission's conclusion that these were post-injury earnings is supported by competent evidence. As such, defendants cannot seek a credit for these payments because they were due and payable when made.

### 5. The $4,500,000.00 Signing Bonus

Defendants contend they are entitled to a credit of $4,500,000.00 for the signing bonus because "[e]ven though the signing bonus was paid in two lump sums, for salary cap purposes and pursuant to the Collective Bargaining Agreement, that $4,500,000.00 signing bonus is considered to be spread over the five-year length of Employee-Plaintiff's Contract." In finding of fact 14, the Commission found: "The payment of a deferred 3.5 million dollar signing bonus on April 3, 2001, relates back as an amount plaintiff earned, though later paid, for signing with the Panthers in February of 2000." According to plaintiff's contract:

> As additional consideration for the execution of NFL Player Contract(s) for the year(s) <u>2000, 2001, 2002, 2003, and 2004</u>, and for the Player's adherence to all provisions of said contract(s), Club agrees to pay Player the sum of Four Million Five Hundred Thousand Dollars <u>$4,500,000</u>.

> The above sum is payable as follows:

> <u>$1,000,000</u> PAID ON 2/22/00. . . .

> <u>$3,500,000</u> on April 1, 2001.

According to the Panther's general manager, plaintiff would have received the remainder of his signing bonus even if he had not been placed on the 2001 roster. The general manager also explained that even though the signing bonus was paid in two lump sums in 2000 and 2001, for salary cap purposes, the signing bonus amount is spread over the length of the contract. Notwithstanding this testimony, however, plaintiff became entitled to the signing bonus upon signing the contract, which occurred pre-injury. Therefore, finding of fact 14 is supported by competent evidence. As such, defendants may not seek a credit for the signing bonus because it was due and payable when made.

**SMITH v. RICHARDSON SPORTS LTD. PARTNERS**

[168 N.C. App. 410 (2005)]

[3] We now turn to the remaining payments for which defendants seek a credit: (a) the $225,000.00 injury protection provision payments paid during the 2001 regular season, (b) the $750,000.00 one year skill and injury guarantee payments paid in 2002, and (c) the injured reserve pay of fourteen $47,059.00 installments in 2000.

> It is well-established that our standard of review of an opinion and award of the Commission is limited to a determination of "(1) whether the Commission's findings of fact are supported by any competent evidence in the record; and (2) whether the Commission's findings justify its conclusions of law."

*Larramore,* 141 N.C. App. at 254, 540 S.E.2d at 770 (citation omitted).

### a. The $225,000.00 Injury Protection Payments

Defendants contend plaintiff received $225,000.00 in seventeen installments between 20 September 2001 and 31 December 2001 for which they are entitled a credit. In finding of fact 17, the Commission found:

> Payments in the sum of $225,000.00 pursuant to the injury protection plan running from September 20, 2001, to approximately December 31, 2001 (made in installments of $13,235.30) represent payments made from revenue designated as employee revenue under the division of revenue between management and the players' union pursuant to the collective bargaining agreement. The source of the injury protection plan monies were paid *in toto* by all NFL player-employees, including plaintiff, and is for a type of disability plan. The revenues that funded this plan, which was the source of the payments made to plaintiff, were not paid by the employer.

Defendants also contend the Commission's finding the injury protection plan was employee-funded is unsupported by competent evidence. We agree this finding of fact is not supported by competent evidence.

In this case, Tim English ("English"), staff counsel for the NFL Players' Association, gave the following explanation of how the injury protection plan was funded. First, he explained that NFL revenue generated from television and ticket sales is the "designated gross revenue"[8] for the League. Then, according to English, pursuant to the

---

8. The CBA refers to this money as "defined gross revenue," not "designated gross revenue." As the CBA uses the term "defined gross revenue," we will use the same term for clarity.

CBA, the portion of the defined gross revenue that can be used for player salary and benefits is limited by a salary cap, which was sixty-three percent (63%) in 2000. The injury protection plan is part of the benefits a player receives under the CBA. Then, English testified as follows:

> Q. Now, what is the source of the injury protection payments that are listed on this document, beginning on 9-20, 2001, and you may presume that it went up through 12-31, 2001?
>
> A. Well, the player's side of the revenue, the sixty-three percent or so, is divided up generally into two categories. The vast majority of the money goes into the salary cap, which the players'—all the players' salaries come out of. And a smaller amount goes into what's called the benefit cap.
>
> . . .
>
> Q. Well, stated alternatively for purposes of the question, did Chuck Smith's injury protection money come out of the players' side of the revenue, the sixty-three percent, or the management side of the revenue, the thirty—thirty-seven percent?
>
> A. Yeah, the players' side of the revenue.

Although English testified that the injury protection plan is funded out of the players' side of the revenue used for the salary cap, he did not testify that sixty-three percent (63%) of the defined gross revenue generated belonged to the players. Indeed, the CBA indicates the defined gross revenue belongs to the NFL and the NFL teams. In Article XXIV, Section 1(a)(i), the agreement states in pertinent part:

> "Defined Gross Revenues" (also referred to as "DGR") means the aggregate revenues received or *to be received* on an accrual basis, for or with respect to a League Year during the term of this Agreement, *by the NFL and all NFL Teams* (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below. The NFL and each NFL Team shall in good faith act and use their best efforts, consistent with sound business judgment, so as to maximize Defined Gross Revenues for each playing season during the term of this Agreement. . . .

(Emphasis added.)

## SMITH v. RICHARDSON SPORTS LTD. PARTNERS

[168 N.C. App. 410 (2005)]

In this case, the testimony regarding the salary cap and revenue did not provide a clear explanation of how the process worked. The lack of a clear explanation led to contradictory results. According to English, all of the players' salary and benefits in 2000 were paid out of the sixty-three percent (63%) salary cap. The salary and benefits included, among other things, the injury protection plan and the injured reserve pay. Thus, the $47,059.00 weekly injured reserve payments plaintiff received was paid out of the sixty-three percent (63%) salary cap. Similarly, the injury protection plan payments received by plaintiff in 2001 would have been paid out of the salary cap.[9] However, the Commission determined in finding of fact 16 that the injured reserve payments were made pursuant to an employer totally funded disability plan. Then in finding of fact 17, the Commission determined the injury protection plan was employee funded. These findings of fact are contradictory as the injured reserve pay and the injury protection plan payments were part of the salary cap. The Commission's findings of fact do not clarify the contradiction.

Therefore, we conclude the determination that the injury protection plan payments were from an employee-funded plan is unsupported by competent evidence as there is insufficient evidence upon which a determination can be made. Accordingly, we remand to the Commission for the hearing of additional evidence and further findings of fact as to whether the injury protection plan is employee funded, employer funded, or both. If the injury protection plan is employer funded, then the Commission must determine if a credit should be awarded in accordance with this opinion. As plaintiff did not appeal the Commission's determination in finding of fact 16, that the injured reserve pay was part of an employer-funded disability plan, the Commission shall not address whether injured reserve pay was employer-funded or employee-funded on remand.

### b. The $750,000.00 Payment

Defendants also contend they are entitled to a credit for the $750,000.00 paid to plaintiff in 2002 pursuant to the One-Year Skill and Injury Guarantee which is Addendum B to plaintiff's 2001 contract. This guarantee stated:

9. Defendants also argue that under English's interpretation of the NFL CBA, all of the players' salaries and benefits would have been paid out of money belonging to the players. According to defendants, this would mean the players paid themselves. We express no opinion on the merits of defendants' argument as the Commission may consider it on remand.

Despite any contrary language in this NFL Player contract, Club agrees that for 2002 only it will pay Player Seven Hundred Fifty Thousand Dollars ($750,000) of the salary provided in Paragraph 5, if, in Club's sole judgment Player's skill for performance is unsatisfactory as compared with that of other players competing for positions on Club's roster and Player's contract is terminated via the NFL waiver system, or, if, due to an injury suffered while participating or playing for the Club prior to the 2002 season Player, in the sole discretion of Club's physician, is unable to pass Club's pre-season physical examination for 2002 and Player's contract is terminated via the NFL waiver system.

This guarantee by Club only applies for the 2002 season, regardless of whether Player is under contract or option to Club for a subsequent year; and regardless of whether Player passes Club's physical examination for a year subsequent to 2002.

This guarantee is for one year only and in no way supersedes or obviates the applicability of the League's waiver system to Player.

Although the parties stipulated that plaintiff would receive $750,000.00 in seventeen equal payments during the 2002 football season, the Commission did not render any findings of fact or conclusions of law as to whether it would award defendants a credit for these payments. Thus, this case must be remanded to the Commission for a determination of whether defendants are entitled to a credit for these guarantee payments in accordance with this opinion.

### c. Fourteen Payments of $47,059.00 in 2002

In finding of fact 16, the Commission found defendants made fourteen post-injury weekly payments of $47,059.00 pursuant to an employer totally funded disability plan. As stated, plaintiff did not appeal the determination that these payments were from an employer totally funded disability plan. In conclusion of law 4, the Commission determined "[d]efendant is entitled to a credit for 14 weeks of compensation payments at the weekly rate of $588.00, to be deducted from the end of the 300-week period under N.C. Gen. Stat. §§ 97-30 and 97-42." Defendants contend they are entitled to additional weeks of credit for the time period between the last regular season game in 2000 through the end of plaintiff's yearly contract on the last day of February 2001. Defendants did not make any payments to plaintiff

during this time period. However, they argue that because plaintiff was paid his yearly salary during the seventeen week regular season, as earnings and injured reserve pay, they should be awarded a credit extending to the end of the contractual year.

As explained, the 1994 amendment to N.C. Gen. Stat. § 97-42 precludes the dollar-for-dollar credit allowed by *Evans*, and allows a credit against compensation for weeks during which the employer-funded disability benefits were paid. *See* N.C. Gen. Stat. § 97-42; N.C. Academy of Trial Lawyers, *Work Place Torts and Workers' Comp 1994, 1994 Workers' Compensation Reform Act*, Henry N. Patterson, Jr. Although defendants are not seeking to carry-forward a portion of the $47,059.00 payment to subsequent weeks in the contract year, they are seeking a credit for weeks in which they did not make any payments. To allow such a credit would be contrary to the spirit of the 1994 amendment. *See Shelton v. Morehead Memorial Hospital*, 318 N.C. 76, 81-82, 347 S.E.2d 824, 828 (1986) (stating "[l]egislative intent controls the meaning of a statute; and in ascertaining this intent, a court must consider the act as a whole, weighing the language of the statute, its spirit, and that which the statute seeks to accomplish").

Nonetheless, N.C. Gen. Stat. § 97-42 allows an employer to modify how a credit is applied by including the modification in its benefits or wage continuation plan. On remand, the Commission may hear additional evidence and may make further findings of fact as to whether the effect of N.C. Gen. Stat. § 97-42 has been modified in this case.

[4] Finally, defendants challenge finding of fact 18 which states: "Plaintiff's post injury wage earning capacity outside of the NFL is $40,000.00 per year during the relevant 300-week time period covered by N.C. Gen. Stat. § 97-30." At the time of the hearing on 22 March 2002, plaintiff was earning $40,000.00 a year as a radio announcer. Defendants argue the Commission's determination that plaintiff would only make $40,000.00 a year throughout the entire 300 week compensation period was speculative. Defendants argue plaintiff could obtain employment making the same or greater amount of money that he was making with the Panthers. Therefore, defendants argue finding of fact 18 is not supported by the evidence. We disagree.

Plaintiff's uncontradicted testimony that he was making $40,000.00 a year was competent evidence upon which the Commis-

sion could determine plaintiff's wage-earning capacity. Moreover, if plaintiff's income changed and plaintiff began making more than $40,000.00 a year during the 300 week period, such that he was no longer entitled to the maximum compensation rate, defendants could move to terminate or diminish the amount of compensation pursuant to N.C. Gen. Stat. § 97-47. *See also Smith v. Swift & Co.*, 212 N.C. 608, 194 S.E. 106 (1937) (indicating a party can move for a modification of an award if the claimant began receiving a higher salary post injury than his average weekly wage prior to injury as the change in salary could constitute a change in condition).

In sum, we conclude the Commission properly classified the roster bonus, signing bonus, minicamp, workout, and appearance fees as plaintiff's earnings for which defendants were not entitled to a credit, as these payments were due and payable when made. Similarly, the Commission correctly found the 18 September 2000 $47,059.00 payment was for services rendered during the prior week, including the 17 September 2000 game in which plaintiff was injured. Also, the Commission's finding that plaintiff was entitled to 300 weeks of compensation was supported by competent evidence. However, the Commission did not make any findings of fact or conclusions of law regarding the $750,000.00 payments to be received by plaintiff in 2002. Also, the Commission's finding that the $225,000.00 injury protection payments were paid out of an employee-funded plan was unsupported by competent evidence. Finally, the parties are allowed to present argument to the Commission as to whether additional credit should be awarded for the injured reserve pay paid to plaintiff in 2000. Accordingly, this case is remanded to the Commission for further proceedings in accordance with this opinion.

Affirmed in part, remanded for further proceedings in part.

Judges MARTIN and TIMMONS-GOODSON concur.